```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT
```

|                                |   |                         |
|--------------------------------|---|-------------------------|
| UNITED STATES OF AMERICA,      | : |                         |
|                                | : |                         |
|     Plaintiff, | : |                     |
|                                | : |                         |
|     v.     | : | No. 1:11-cr-00143 (jgm) |
|                                | : |                         |
| JUDY ANDREA HARRIS,            | : |                         |
| GAMALIEL AZAYA OLIVER,         | : |                         |
|                                | : |                         |
|     Defendants. | : |                    |

<u>OPINION AND ORDER ON MOTIONS TO SUPPRESS
PHYSICAL EVIDENCE AND STATEMENTS</u>
(Docs. 19 and 20)

Defendants Judy Andrea Harris and Gamaliel Azaya Oliver have moved under Federal Rule of Criminal Procedure 12(b) to suppress physical evidence and statements obtained by law enforcement officials as a result of two automobile stops and a subsequent transport to the DEA office. (Docs. 19, 20.) Ms. Harris is charged with a single count of possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and Mr. Oliver is charged with a single count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). <u>See</u> Superceding Indictment (Doc. 10).

Having considered the parties' pre-hearing memoranda (Docs. 19, 20, 21), post-hearing memoranda (Docs. 32, 33, 36, 37), and having assessed the testimony and credibility of four law enforcement witnesses and of Defendant Oliver at the April 26,

2012 suppression hearing, together with the exhibits submitted at the hearing, the Motions to Suppress are granted and all evidence derived from the initial stop of Defendants suppressed for the reasons stated below.

## I. BACKGROUND

The following facts were adduced at the suppression hearing and are summarized in the parties' memoranda and submissions. Any factual disputes are resolved to the extent necessary, as provided below. Fed. R. Cr. P. 12(d).

A.  <u>Events Leading to the Enosburg Automobile Stop</u>

On October 25, 2012, in Enosburg, Vermont, Defendants Judy Harris and Gamaliel Oliver left Harris' residence on Kenneson Drive in a black Chevrolet Tahoe, turned right from Kenneson onto Pleasant Street, and drove a short distance, described as approximately 50 feet, perhaps more, from Kenneson Drive to a stop sign at the intersection of Pleasant Street and Route 105. (Apr. 26, 2012 Hr'g Tr. (Doc. 27), Oliver Test. at 160-161.)

Oliver testified that on that short stretch of Pleasant Street, he had reached a speed of approximately 20 to 25 miles per hour, came to a complete stop at the intersection, and looked both ways to see which way he would turn. <u>Id.</u> at 161. Asked if he had to slam on the breaks in order to stop, Oliver testified, "No, not at all." <u>Id.</u> Mr. Oliver, who was driving the Tahoe, is African American, and Ms. Harris, his passenger, is white.

2

Border Patrol Agent Matthew Emrich, who was on roving patrol in Enosburg, Vermont in a marked SUV, was passing through the intersection where Defendants stopped, travelling west on Route 105 towards Enosburg. (Emrich Test. at 40.)

According to Emrich's initial October 25, 2011 report of his encounter with Defendants, he saw "two individuals" in a "suspicious" Chevy Tahoe bearing New York plates "drive West onto Route 105 and head through Main Street in Enosburg leaving town." (Doc. 21-1 at 3; Def.'s Ex. A9E.) The initial report does not mention the Tahoe's approach to the stop sign. "In an attempt to get a better view of the vehicle and the individuals inside," the report states, Emrich positioned himself at a different intersection -- Route 105 at Route 236. (Doc. 21-1 at 3; Def.'s Ex. A9E.)

Approximately ten minutes later, the Tahoe passed his position, "heading West on Route 105." (Doc. 21-1 at 3.) The report notes that, "as the vehicle passed," "[b]oth the passenger and driver made an obvious attempt to hide themselves behind the 'B Pillar of the vehicle', so as not to be seen," and then continued "driving noticeably below the posted speed limit." Id. Emrich then followed the vehicle while running a registration check, which indicated the Tahoe was a Hertz rental out of New Jersey. Id. He then stopped the Tahoe.

Emrich later made an Addendum to the same report, relating that on November 1, 2011, he was contacted by Assistant United States Attorney Jeanie Cowles and asked to provide some clarifying details about the encounter with the Defendants. Id. at 4.

The Addendum reported that Emrich first observed the Tahoe coming north on Pleasant street towards the intersection with Route 105, and "[j]ust prior to approaching a stop sign both occupants locked eyes with BPA Emrich's marked Border Patrol vehicle and responded by aggressively applying the brakes to stop the vehicle." Id. The Addendum noted the occupants were "surprised and shocked" at the sight of the Patrol car, and Emrich wrote this was an "odd response." Id.

After bypassing traffic in Enosburg and repositioning his Patrol car further along Route 105 at the intersection with Route 236 to better observe the Tahoe, the Addendum notes, Emrich saw the Tahoe approach again, "travelling at the posted speed limit" and "keeping adequate spacing for the flow of traffic in this area," but noted that "prior to passing" his position, the Tahoe "suddenly 'nose dived'" and "slowed to a speed much lower then [sic] the posted speed limit" of 50 mph. Id. at 5. In addition to hiding behind the B pillar, as noted in the initial report, the Addendum stated that as the Tahoe continued on Route 105, cars began to "stack" behind it and the Tahoe drifted toward the

4

fog line.  Id.  The Addendum noted this response to the presence of his marked BPA car "appeared odd."  Id.

Furthermore, while Emrich entered the traffic lane to follow the Tahoe and run the registration check, the Tahoe's passenger looked "back and forth" over her shoulder while "on a cellular phone."  Id.  Several times, the Tahoe drifted "in an attempt to what BPA Emrich perceived to have him pass their vehicle."  Id.  The Addendum, like the initial report, notes that Emrich then conducted the stop.  Id.

At the suppression hearing, Agent Emrich conceded Oliver and Harris were just "short" of one of Kenneson Drive's two entrances to Pleasant Street and "fairly close" to the stop sign when he first observed them approaching it.  (Emrich Test. at 40.)  He also stated that the Tahoe was travelling "at a normal rate of speed" as it approached the stop.  Id. at 10.  Consistent with his report, Emrich testified the Tahoe "nose dived" at the stop sign in a "rapid aggressive brake."  Id.  Emrich's testimony, however, did not recount that Defendants had an emotional reaction at this first sighting, other than to say they both had a "deer-kind-of-in-the-headlights look" when they saw his vehicle.  Id. at 12.

Agent Emrich, who is not authorized to give traffic citations, id. at 51, conceded on cross-examination that he did not observe the Tahoe commit any traffic violations.  Id. at 39.

5

He also agreed there was nothing unusual about his first sighting of the Tahoe, other than it came to a quick stop at the stop sign, and stated this was why he "went to a different vantage point" six or seven miles away, where he waited ten minutes, to further observe the Tahoe. Id. at 42.

Agent Emrich's testimony reiterated that on second sighting, the approaching Tahoe was travelling at the speed limit of 50 miles per hour. Id. at 43-44. When it passed the marked Border Patrol SUV, "the nose of the vehicle dove," indicating "they just slammed on their brakes." Id. at 44. Emrich also stated that as the car passed his vehicle, he noticed both occupants "kind of hiding behind the B-pillar." Id. at 12. Agent Emrich allowed three other cars to pass before he pulled into the traffic lane to follow the Tahoe. Id. at 47.

The Tahoe proceeded at a speed below the limit, and the three other vehicles between Emrich and the Tahoe "stacked up" behind the Tahoe and began to pull to the right of the travel lane to allow the Border Patrol vehicle, which had not activated any lights, to pass. (Id. at 47; Oliver Test. at 164, 177.)

Defendant Gamaliel Oliver testified that when he saw the vehicles behind him "pulling over" to allow the Border Patrol to pass, and the Patrol car passed them, Oliver then "pulled over a little bit so he could pass me, also." (Oliver Test. at 164.) Agent Emrich did not dispute that the other vehicles drifted

toward the fog line to let him pass, or that the Tahoe's movement toward the fog line was a similar maneuver to allow him to pass. (Emrich Test. at 48 (Tahoe "appeared to be rubbing on the fog line. I took it as an attempt to like to: Hey, go past me, I'm driving slowly, go by me").) When Emrich was asked if it was unusual for a vehicle to want to rid itself of a tailing police car, he answered: "Is that unusual? . . . Yes." Id.

Oliver, when asked at the hearing whether he tried to hide behind the B pillar, replied "No, sir." (Oliver Test. at 163.) Agent Emrich, when shown Defendant's Exhibit B4 (a picture of a Chevy Tahoe showing the Tahoe's "B pillars" where the front seat headrests would be), conceded that the head rests for the front seats "could be" directly behind the B pillar. (Emrich Test. at 60.)

Agent Emrich testified that he followed the Tahoe, which was travelling at about 40 miles per hour, perhaps 35, for four or five minutes while he ran a registration check, without activating his lights. Id. at 12, 49. During this time, the Tahoe drifted towards the fog line on occasion, but Emrich did not pass the Tahoe. Id. at 48. The passenger "appeared to be" on a cell phone and turned around on "[a]t least two occasions." Id. at 49-50. At this point, Emrich had completed the registration check and made a decision to stop the vehicle,

activating his lights. Id. at 50. He stopped the Tahoe at about 3:38 p.m. Id. at 51.

B. Events Surrounding the Enosburg Stop

Approaching the passenger side of the Tahoe, Emrich asked Oliver, the driver, where they were headed, if they had documentation on them, and to whom the Tahoe belonged. Id. at 14. Defendants produced Oliver's New York driver's license and Harris' Vermont nondriver identification card. Id. at 15. When Oliver reached into the glove box to search for the rental contract, a large sum of money wrapped in a plastic bag fell from the glove box. Id. at 16. Harris told Emrich it was her money. Id. Then Emrich returned to the SUV to run warrant and criminal history checks. Id. at 17. While waiting for a response, he patted down and interviewed Oliver outside the Tahoe. Id. at 17-18. The pat-down revealed a bulge in Oliver's pocket, and Oliver told the agent it was approximately $1,500 in cash. Id. at 18. Oliver stated he was picking Harris up to take her to Burlington. Id. at 19. Although Harris had stated Oliver was her boyfriend, Oliver told Emrich Harris was a friend. Id. Oliver told Emrich the money in the glove box was not his, that he was unemployed, and upon producing the rental contract, which indicated the Tahoe was a three-month rental for $3,200, Emrich questioned him about why he had rented the car, but cannot recall his responses. Id.

at 19-20.  The records check on Oliver confirmed what Oliver had just told Emrich -- he had a prior drug conviction.  Id. at 21.

Ten or fifteen minutes into the stop, Emrich called for backup and a K9 unit.  During the wait, Harris informed him she was going to her father's home in Essex, and that Mr. Oliver was a friend.  Id. at 22.  Harris also told Emrich that the money in the glove box amounted to $8,000,[1] that she lived in Enosburg, and was unemployed.  Id. at 23.  She explained that the money had been collected from family members in Burlington, to prevent their spending it, and to save for a family vacation.  Emrich noted the oddity of travelling back and forth to Burlington to collect money, and she responded that this was how they did things.  Id. at 23. Harris further stated the family trip to Florida would occur that day with her father and sister, but they did not have plane tickets (she planned to buy them at the airport), an itinerary, or a destination.  Id. at 24-25.

Border Patrol Agent Ross and another agent arrived on the scene with a K9.  Harris agreed to sit in Emrich's vehicle to get out of the cold during the dog sniff.  Agent Ross came to report the dog was alerting on the vehicle, near the glove box, and upon questioning Harris further, she offered to call her sister to verify her story.  Id. at 27, 29.  Emrich understood that the

---

[1] Ms. Harris had stated she was not certain of the quantity -- a count at the police station later revealed the sum to be $11,290.00.  (Doud Test. at 102-03.)

9

sister reacted to Agent Ross' call by being furious the money was to be spent on a vacation, stating her living situation was insecure. Id. at 27-28.

When a search of the vehicle produced no contraband, the agents let Oliver and Harris go without seizing the glove box cash. Id. at 30. The Enosburg stop and search had lasted forty-five minutes to an hour. Id. at 31.

C. Events Surrounding the Burlington Automobile Stop

Border Patrol Agent Mike Grindell, assigned to a DEA Task Force, radioed information regarding the Enosburg stop to the Burlington DEA office. (Doud Test. at 90.) DEA Agent Thomas Doud, when informed that the Tahoe was a rental, the driver was from New York and had a narcotics conviction, both the driver and passenger had large amounts of cash and were nervous when being questioned, left to join the traffic stop in Enosburg. Id. at 91-92. Doud was aware no contraband had been found. Id. at 127.

When Doud was told Harris and Oliver had been allowed to leave, he decided to intercept the Tahoe on its route. Id. at 92-93. Doud was familiar with Ms. Harris because her name had surfaced in DEA investigations in the early 2000s, although she had no arrests or convictions. Id. at 94, 134. Doud, stuck in traffic headed north, spotted the Tahoe headed south on I-89 in the opposing lanes and maneuvered off-road to the south-bound lanes to follow it. Id. at 97. In Burlington, Burlington police

10

officers enlisted to support Doud stopped the Tahoe on Hyde Street at about 5:30 p.m.  Id. at 98-99.  Doud acknowledged that once the police stopped the Tahoe, Oliver and Harris were not free to leave.  Id. at 123.

A total of six DEA agents and several Burlington officers were present at the stop.  Id. at 123.  Doud and at least three other agents separated the Defendants, and Harris was placed in Doud's patrol car.  Id. at 100-01.

When questioned about the glove box money, Harris claimed the approximately $8,000 was hers, but later clarified that half belonged to her sister, and $900 to Oliver.  Id. at 102-03.  In response to questioning about the vacation and whether she had drugs on her person, Harris insisted she had no drugs and indicated she was willing to be strip searched and have a pap smear at the hospital.  Id. at 105-06.  Harris also showed Doud the glove box money, which she had hidden in her bra.  Id. at 106.  She told Doud Oliver was a casual acquaintance giving her a ride to Burlington.  Id. at 107.

Doud then interrogated Oliver about the money.  Id. at 107-08.  Oliver told Doud between $1,400 and 1,500 of the cash belonged to him -- he had given Harris the sum after the first stop, to change into larger denominations, and by the time they were stopped the second time, she had given him $900 back in larger bills.  Id. at 109.  Doud told Oliver he was concerned

11

Oliver had falsified his identity, which Oliver denied.  Id. at 109-10.  Doud testified he felt it was necessary to bring Oliver back to the station for fingerprinting, although he admitted there was no reason to believe Oliver, whose identity and criminal record had been confirmed, was actually someone else.  Id. at 112, 128.  When Doud told Oliver he would be free to leave the station if his fingerprints checked out, he testified Oliver agreed to be transported for fingerprinting.  Id. at 112, 131.  Oliver testified that he questioned why the fingerprinting was necessary, and that his request to drive himself there was denied.  (Oliver Test. at 170.)  Realizing he would not be allowed to leave unless he agreed to the fingerprinting, Oliver finally agreed because he believed he had "no choice."  Id. at 170-71.

Doud returned to Harris and told her Oliver would be going in for fingerprinting, and that he was interested in searching the Tahoe.  (Doud Test. at 114.)  When Doud reiterated that he believed the money was drug related, Harris adamantly denied this and invited the DEA to check the bills.  Id.  Doud suggested they take the Tahoe to the DEA Office.  Id. at 113.

D.   Interrogation and Search at the DEA Office

As the agents took Oliver into the DEA Office, they realized he had not been frisked since the initiation of the second stop.  (Couture Test. at 141.)  They attempted to frisk

12

him, and he fled. Id. at 142. He was caught after a short chase, cuffed, strip searched, and a gun discovered in his groin area. Id. at 143-44.

Harris, meanwhile, transported separately by Doud, entered unrestrained into a basement interview room. (Doud Test. at 116.) After Doud told Harris a female officer was on her way to search her and left her with other agents, Harris told those agents she had "what they were looking for." Id. at 117. When Doud returned, Harris told him she had crack cocaine and pills in her pants and offered to remove them. Id. Doud insisted she wait for the female officer, and at this point read her Miranda warnings and "explained some of the concepts of cooperation." Id. at 117-18. When asked whether she would be willing to speak with police, Harris asserted her right to counsel and gave Doud the name of her attorney. Id. at 118. Doud then continued speaking to Harris, giving her a list of topics on which he wanted cooperation. Id. Doud testified he attempted to get in touch with her attorney. Id. Then, Burlington Police Officer Jesse Stewart arrived and conducted a strip search of Ms. Harris, which revealed a bag of cocaine base and a bag of oxycodone. Id. at 119-20.

## II. DISCUSSION

### A. Standard on a Motion to Suppress

A defendant seeking to suppress evidence in a criminal case "has the obligation to present evidence in court . . . designed to convince the court that his motion should be granted." United States v. Thompson, 409 F.2d 113, 117 (6th Cir. 1969) (citations omitted); see also United States v. Flores, No. 99 CR 1110, 2000 WL 1597880, at *2 (S.D.N.Y. Oct. 27, 2000). Once a defendant has established a potential basis for suppression, "the Government bears the burden of proving, by a preponderance of the evidence, that the officers' actions were lawful." United States v. Torres, 2011 WL 2209144, at *5 (S.D.N.Y. June 7, 2011) (citing United States v. Echevarria, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010)).

### B. Insufficient Basis for Reasonable Suspicion Justifying the Enosburg Stop

A traffic stop is a limited seizure within the meaning of the Fourth Amendment. United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994). A traffic stop, therefore, "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, *of unlawful conduct*." Id. (emphasis added) (citing Terry v. Ohio, 392 U.S. 1 (1968). Any evidence seized or obtained as a result of an illegal stop is subject to the "fruit of the poisonous tree" doctrine, and may be suppressed. Id. (citing Wong Sun v. United States, 371 U.S. 471 (1963)).

14

A stop must be based on more than just an "inchoate and unparticularized suspicion or 'hunch'" about possible criminal activity. United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted). It requires reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). A court must "look to the totality of the circumstances to see whether the officer had a 'particularized and objective basis' to suspect criminal activity." United States v. Padilla, 548 F.3d 179, 187 (2d Cir. 2008) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

Here, Agent Emrich conceded that his observations at the intersection of Pleasant Street and Route 105 did not provide him with "any information at all to suspect [defendants] were involved in any kind of illegal activity." (Emrich Test. at 41-42.) The Court credits Oliver's testimony that he braked appropriately, and not aggressively, at the stop sign, particularly in light of the undisputed evidence that the Tahoe could have travelled only a short distance before reaching the stop sign. It is also reasonable to infer that the Tahoe could not have gathered enough speed to require an unusual braking maneuver to come to a complete stop at the sign.

The question, then, is whether the information Agent Emrich gathered when he observed the Tahoe for a second time, further

down Route 105, provides a sufficiently "particularized and objective basis" to suspect criminal activity.

Emrich's testimony and report that the Tahoe's passengers "hid" behind the B-pillar conflicts with Oliver's credible testimony that he did not hide behind the pillar, and evidence that the Tahoe's front seats are, in any case, normally placed somewhere between the B pillars. Therefore, the Court finds that the government has not shown by a preponderance of the evidence that the Defendants were being furtive, rather than behaving normally, in their movements within the car.[2] The government, furthermore, has not explained what a "deer in headlights" look means, or how it is an objective indication of criminal activity.

The evidence that the Tahoe slowed down, travelled below the speed limit, and moved towards the fog line to let the Border Patrol vehicle pass does not provide an objective basis for reasonable suspicion. Rather, these are manifestly innocent behaviors, exhibited by at least three other innocent drivers, who drove at the same speed and did the same thing in response to being followed by the Border Patrol car, but who were not subjected to a stop.

As defense counsel points out, the Tahoe was not being driven in a high-crime area, or late at night, or along a known

---

[2] Indeed, the assertion that Defendants manifested a "deer in headlights" look is at odds with the suggestion they were hiding behind the pillar.

16

drug trafficking route. Def. Harris' Post-Hr'g Mem. at 10 (Doc. 33).

The totality of the driving behavior Defendants exhibited, together with the fact that Defendants were in an out-of-state rented vehicle, cannot support reasonable suspicion for a stop in the particular circumstances of this case. If it did, the basis for reasonable suspicion would be so broad and general so as to "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures." Reid v. Georgia, 448 U.S. 438, 441 (1980) (finding reasonable suspicion lacking where petitioner -- said to fit a "drug courier profile" -- arrived from Fort Lauderdale, a principal place of origin for cocaine, in the early morning, appeared to wish to conceal he was travelling with a companion, and had only a shoulder bag for luggage).

Defendants cite several cases indicating that the circumstances here presented as a basis for the stop are closer to the "slender reed" of an "inchoate and unparticularized suspicion or 'hunch'" than they are to circumstances that courts have upheld as supporting reasonable suspicion. Id.; see e.g., United States v. Jimenez-Medina, 173 F.3d 752, 755 (9th Cir. 1999) (slow speed, driver pre-occupation, out-of-state plates and vehicle registered to Mexican national failed to support reasonable suspicion); United States v. Sigmond-Ballesteros, 285

17

F.3d 1117, 1122 (9th Cir. 2001) (lane change and movement to side of road by driver followed by Border Patrol failed to support reasonable suspicion where motor vehicle handbook instructed drivers being tailgated to pull off the road and let tailgaters pass); United States v. Jones, 269 F.3d 919, 927 (8th Cir. 2001) ("[W]hen the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from [preoccupation] is destroyed." (internal quotation marks and citation omitted)).

The Court holds there are insufficient specific and articulable facts, or rational inferences from those facts, which could support a finding of reasonable suspicion of unlawful conduct justifying the Border Patrol stop in Enosburg.

The lack of reasonable suspicion for the first stop renders all that followed the stop the fruit of an illegal seizure. Emrich's report of the stop and the money discovered in the Tahoe's glove box became the basis for the second Burlington stop, the interrogations and transport to the police station, and the subsequent search and seizure of contraband from Ms. Harris and a weapon from Mr. Oliver. When one officer transmits information to other officers, if the first officer acted "in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." United States v. Hensley, 469 U.S. 221, 232 (1985).

III. CONCLUSION

Accordingly, the Defendants' Motions to Suppress (Docs. 19 and 20) are GRANTED, and all evidence resulting from the Enosburg stop must be suppressed as fruit of the poisonous tree.

All pending motions having been disposed of, this case will be placed on a calendar for jury draw on August 22, 2012.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 1st day of August, 2012.

/s/ J. Garvan Murtha<br>
Honorable J. Garvan Murtha<br>
United States District Judge